# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 00-2716

———————

Robert E. Erickson,

    Plaintiff - Appellant,

v.

Farmland Industries, Inc.,
a Missouri corporation,

    Defendant - Appellee.

\*
\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Minnesota.
\*
\*
\*
\*

———————

Submitted:  March 14, 2001

Filed:  November 14, 2001

———————

Before BYE, LAY, and JOHN R. GIBSON, Circuit Judges.

———————

JOHN R. GIBSON, Circuit Judge.

Robert E. Erickson appeals from the entry of summary judgment against him on his age discrimination suit against Farmland Industries, Inc. In February 1998, at the age of 49, Erickson was demoted from his managerial position to a sales job. Erickson argues that he presented sufficient direct evidence of discrimination to place the burden on Farmland to prove that it would have demoted him for legitimate reasons. He also contends that even if he has the burden of proving the demotion was discriminatory, he has carried that burden by showing the reasons Farmland gave for its action were pretextual. Finally, Erickson contends that Farmland retaliated against

him for pursuing his discrimination claim by withdrawing the offer of the sales job. We affirm the judgment of the district court.[1]

Farmland is a farmer-owned cooperative association that provides supplies and services to its members through local co-ops. Erickson went to work for Farmland in 1978 as a fertilizer sales specialist. Over the next twenty years he held various positions, including the position of regional account manager, which Farmland calls "RAM," for Minnesota. RAMs did not supervise other Farmland employees, and the job was not a managerial position. In 1997, however, Farmland restructured its sales force, eliminating the RAM job and creating the Regional Farmland Manager, or in Farmland's terminology, "RFM," position, with different duties and a different role. RFMs were required to supervise other Farmland employees working in the RFM's region, such as fertilizer or feed specialists. RFMs were also responsible for integrating sales programs with other programs Farmland was developing at the local co-ops. Erickson became an RFM on September 1, 1997. Shortly afterwards, Erickson's territory came under the jurisdiction of a new regional vice president, Curt Walther.

From 1990 until December 1997, Erickson was under the supervision of regional vice president Drue Sander. In the fall of every year from 1991 to 1997, Sander evaluated Erickson's performance as RAM, and each year Erickson had received an "achieves expectations" grade. According to Sander, these evaluations depended heavily on objective information about "retail development, sales manager involvement in wholesale activities, the sales volume numbers, and . . . the margin generation of . . . those activities." In assigning grades, Farmland "tried to be as objective as possible in terms of letting the numbers . . . call it at the end of the year." In the mid-1990's Sander perceived that the role of the account manager at Farmland

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

was likely to evolve from merely focusing on retail development to directly supervising the sales force within the geographic area. Sander concluded that such a development would require the RAMs to build relationships within Farmland as well as with their customers. About that time Sander learned of incidents in which Erickson had behaved badly and had undermined his relationships with others within Farmland. At a training program for a new fertilizer sales program, Ag-21, Erickson had been so disruptive that the Ag-21 team sent Sander a two-page memo detailing Erickson's poor behavior. Sander also received copies of two e-mails Erickson had sent to other Farmland employees that were "destructive to relationships." Sander responded by sending Erickson a memo about the Ag-21 incident and the e-mails that said: "[T]hese kinds of events will not be acceptable methods of operation within my staff, and continued behavior of this type will result in disciplinary action." Also in response to concern about Erickson, Sander began including a peer review section in the annual performance reviews. Some of the peer review evaluations on Erickson were quite negative, and Erickson's 1995 performance evaluation showed a peer review evaluation that fell between #2 ("favorable") and #1 ("a problem for you").

In late 1997, a few months after the reorganization of the sales force, Farmland CEO Harry Cleberg received a phone call from Donald Gales, the manager of the local co-op in St. James, Minnesota, Farmland's biggest customer in Minnesota and its second biggest customer nationally. Gales complained that Erickson had not adapted to the expanded RFM role and that there was no point in creating the expanded role if the co-ops were only going to get what Erickson was providing. Gales told Cleberg that the St. James co-op was not "getting the kind of leadership and assistance from Mr. Erickson that we needed and expected." Farmland management attached special significance to Gales's call because the St. James co-op was such a large customer, because it was also a member of Farmland (which is owned by its members), and because Gales thought Erickson's deficiencies important enough to go straight to the CEO about them.

-3-

Also in the fall of 1997, four co-ops in Minnesota asked Cleberg to meet with them about grain business issues. Cleberg came to the meeting, as did Farmland's Executive Vice President for its world-wide grain business. Erickson did not attend the meeting. As Robert Honse, the Chief Operating Officer of Farmland, said: "When the CEO of a $10 billion Fortune 200 company is asked to come out to the field and the fellow responsible for that geography doesn't even think it's important enough [to attend], that raises a major concern."

Following the phone call from Gales, Cleberg spoke to Honse, who in turn spoke to Walther, about assessing Erickson's performance. Walther arranged to go with Erickson on a two-day tour around Erickson's territory. After the tour, Walther concluded that Erickson could not provide the leadership the co-ops were looking for. Walther decided that Erickson "was very naive about his job and that he really didn't understand his job. And the reason he didn't understand his job is because he detached himself from it." Walther also received a phone call from a fertilizer manager at a large co-op in Truman, Minnesota who said that the general manager of his co-op hadn't seen or heard from Erickson in a year.

Walther recommended that Erickson be moved to a fertilizer sales position in Wisconsin. The recommendation was approved by Honse and Cleberg.

Walther and Erickson met on February 25, 1998. Walther told Erickson he was being replaced as RFM for Minnesota and offered him the Wisconsin fertilizer sales job, which paid about $10,000 less than Erickson was making as RFM. As Erickson described the meeting, he asked Walther why he was making the change, and Walther brought up various things: "relations wore down, relations with co-ops not the best, you've been there too long, you're stale, those kinds of things, burned some bridges, accounts wanted a change, so those kinds of things." Erickson also quoted Walther as saying, "Twenty years is too long. You should have moved five years ago." For his part, Walther wrote a memo listing the following reasons for the reassignment:

1. Need a new focus in Minnesota.
2. Weak relationship with key Minnesota Accounts.
3. No projects underway for growth under his supervision.
4. Low employee morale in his area.

Farmland filled Erickson's RFM position with an employee who was thirty-nine years old.

Walther initially gave Erickson only two days to decide whether to accept the fertilizer sales position. Erickson asked for more time to consider, and Walther gave him until March 6, 1998. Erickson never responded to the offer, but instead filed a written complaint with Farmland alleging age discrimination. Walther sent a letter to Erickson on March 9, 1998 confirming that Erickson had not accepted the fertilizer sales position and stating that his employment was therefore terminated. Despite this letter, Erickson got in touch with Walther again and they agreed to hold the offer open. Finally, Farmland's Vice President for Human Resources wrote Erickson that if he did not accept the position by May 1, 1998, the offer would be withdrawn. Erickson never accepted the position. He said he "just ignored it."

Erickson filed suit against Farmland alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 623(a) & (d) (1994), and the Minnesota Human Rights Act, Minn. Stat. § 363.03 (2000). Farmland moved for summary judgment, which the district court granted.

We review the district court's grant of summary judgment de novo, using the same standards applicable in the district court. Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999). Summary judgment is proper only if, taking the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

-5-

I.

On appeal, Erickson first argues that he has come forward with direct evidence that suffices to shift the burden of proof on his federal age discrimination claim to the defendant under <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989).[2] According to Justice O'Connor's controlling concurrence in <u>Price Waterhouse</u>, once a discrimination plaintiff shows "by direct evidence that an illegitimate criterion was a substantial factor" in the decision at issue, "the burden then rests with the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." 490 U.S. at 276.

The direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision. <u>See</u> <u>Price Waterhouse</u>, 490 U.S. at 276-77 (O'Connor, J., concurring); <u>Yates v. Douglas</u>, 255 F.3d 546, 548 (8th Cir. 2001); <u>Walton v. McDonnell Douglas Corp.</u>, 167 F.3d 423, 426 (8th Cir. 1999).

Erickson relies on statements by Walther that Erickson was "stale," "set in his ways," and "needed a new focus." He also relies on Walther's statement to him, "Twenty years is too long. You should have moved five years ago."[3] These

---

[2]The Minnesota Human Rights Act claim is not subject to analysis under the <u>Price Waterhouse</u> model. Instead, we must apply the <u>McDonnell Douglas</u> burden-shifting framework to the Minnesota claims. <u>Anderson v. Hunter, Keith, Marshall & Co.</u>, 417 N.W.2d 619, 624-27 (Minn. 1988).

[3]Erickson argues in his brief that Walther said, "Twenty years <u>with the company</u> was too long." Erickson Brief at 8, 20 (emphasis added). This overstates

statements were allegedly uttered by a decisionmaker in explaining the decision to demote Erickson, but they do not directly demonstrate age discrimination.

Length of tenure, although it may correlate empirically with age, is not synonymous with age, and therefore the comment, "Twenty years is too long. You should have moved five years ago," is not direct evidence of age-based animus. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 611(1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"); Slathar v. Sather Trucking Corp., 78 F.3d 415, 418-19 (8th Cir. 1996). To amount to direct evidence of age discrimination, there would have to be evidence that Farmland was using length of tenure as a proxy to accomplish age discrimination. See Hanebrink v. Brown Shoe Co., 110 F.3d 644, 647 (8th Cir. 1997) (summary judgment for employer affirmed where plaintiff adduced no evidence that salary, retirement benefits or health benefits used as proxies for age). Erickson has offered none. Making this comment into evidence of age animus requires an inference, and the comment therefore does not directly reflect an attitude of discrimination based on age. See Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 635 (8th Cir. 1998) (evidence direct where no inference

the evidence. Erickson testified that Walther said, "Twenty years is too long." Erickson testified that he had come to New Ulm, Minnesota approximately twenty years ago. Walther's alleged remark could easily have meant that Erickson should move to a new post, rather than that he should not work for the company for twenty years. After all, Walther was offering to move Erickson, not fire him. Similarly, Erickson says in his brief that Walther told him he "should have been moved five years ago." Erickson Brief at 34 (emphasis added). Erickson's deposition quotes Walther as saying Erickson "should have moved," which is different. The quotation in the record suggests that moving would have been a good choice for Erickson to have made, whereas the language in the brief suggests this is something Farmland should have done to Erickson. We can hardly overstate the importance of accuracy in counsel's descriptions of the record.

necessary); E.W. Blanch Co. v. Enan, 124 F.3d 965, 970 (8th Cir. 1997) (where comment made no direct reference to plaintiff's age, Price Waterhouse burden shifting not appropriate).

As for the remarks that Erickson was stale and set in his ways and that the company needed a new focus, these are all legitimate business concerns. "[I]n evaluating any salesman's performance, statements regarding the individual's aggressiveness, enthusiasm, and vigor are hardly surprising." Young v. Gen. Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988). Again, only by inference could we leap from these remarks to a conclusion that Walther was really talking about Erickson's age rather than his effectiveness as a salesman.

Erickson did not produce the kind of direct evidence of discrimination that would shift the burden of proof to Farmland.

II.

In the absence of direct proof of discrimination, a plaintiff can prove his case under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under this framework, Erickson must establish a prima facie case of discrimination by showing (1) he was a member of the protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was demoted; and (4) he was replaced by a younger person. Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000). Farmland must then offer evidence of a reason other than age-discrimination for its action. Id. If Farmland can do so, Erickson must present sufficient evidence to (1) raise a question of fact as to whether Farmland's proffered reason was pretextual and (2) create a reasonable inference that age was a determinative factor in the decision to demote him. Id. (emphasis added); cf. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001) (After employer proffers non-discriminatory reason,

employee must "either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination." (emphasis added)). We apply this analysis to Erickson's Minnesota Human Rights Act age discrimination claim as well as his federal claim. Bevan v. Honeywell, Inc., 118 F.3d 603, 613 (8th Cir. 1997).

The district court held that Erickson made a prima facie case, and Farmland does not dispute that holding. The district court also held that Farmland had come forth with legitimate reasons for demoting Erickson, specifically "the complaint lodged against him by Gales, his general failure to maintain good relationships with the local cooperatives in his territory, his failure to attend the fall 1997 meeting, and poor relationships with his co-workers."

The only question in dispute is whether Farmland's proffered reasons are pretextual. If Erickson has failed to create an issue of material fact as to pretext, we must affirm the summary judgment against him. Fisher, 225 F.3d at 921 (to avoid summary judgment plaintiff must create issue of material fact as to pretext and create reasonable inference of discrimination); Scroggins v. Univ. of Minn., 221 F.3d 1042, 1044 (8th Cir. 2000); Taylor v. QHG of Springdale, Inc., 218 F.3d 898, 900-01 (8th Cir. 2000); Bassett v. City of Minneapolis, 211 F.3d 1097, 1107 (8th Cir. 2000) ("In an employment discrimination case, if evidence of the employer's proffered reason for its action is undisputed, the movant is entitled to a grant of summary judgment."). To carry his burden of showing pretext, Erickson must show that Farmland's justification for the demotion is unworthy of credence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

We have said, "[I]t is possible for strong evidence of a prima facie case to . . . present a factual issue on pretext." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc). Accord Reeves, 530 U.S. at 143 ("[A]lthough the presumption of discrimination 'drops out of the picture ' once the defendant meets its

burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" (internal citations omitted)). In many cases the employer's proffered reason is that the employee was not performing the job satisfactorily, which is simply the negative of one of the elements of the prima facie case. If the employee has produced evidence that he or she is performing satisfactorily and the employer has produced evidence that he or she is not, this evidence conflicts and may create a fact issue. E.g., Kim v. Nash Finch Co., 123 F.3d 1046, 1058 (8th Cir. 1997) (Even so, this conflict does not necessarily create a genuine issue of material fact because the prima facie case requires only a minimal showing, while a showing of pretext requires more substantial evidence. Sprenger, 253 F.3d at 1111.) But where the employer relies on a more particular objection about the employee distinct from general job performance, this does not necessarily conflict with the employee's prima facie case. For instance, in Kiel an otherwise satisfactory employee was fired because of an episode of insubordination. 169 F.3d at 1135. In such a case, the employee must adduce some evidence of pretext. Id. at 1136.

The employee may do this by showing the proffered explanation had no basis in fact.[4] E.g., Kim, 123 F.3d at 1058 (employer claimed other candidates more qualified than Kim, but Kim's evidence showed they were not).

Another common method of proving pretext is to show that it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case. English v. Colorado Dep't of Corrections, 248 F.3d 1002, 1009

---

[4]Actually, it is not enough to prove that the employer's justification was unfounded– the employee actually has to adduce evidence that the employer knew (or perhaps should have known) the justification was unfounded. Sprenger, 253 F.3d at 1112; Scroggins, 221 F.3d at 1045; Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 n.2 (8th Cir. 1994).

(10th Cir. 2001); see Scroggins, 221 F.3d at 1044 ("[I]nstances of disparate treatment can support a claim of pretext."); 1 Lex K. Larson, Employment Discrimination § 8.04 (2d ed. 2001) ("Probably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment."). In the same vein, even without pointing to other cases that were handled differently, a plaintiff can establish pretext by showing that it was unlikely an employer would have acted on the basis of the proffered reason. See Fisher, 225 F.3d at 921-22.

Evidence of a discriminatory attitude in the workplace, though it may not rise to the level of direct evidence, may also tend to show that the employer's proffered explanation for the action was not the true reason for the discharge. E.g., Fast v. So. Union Co., 149 F.3d 885, 890-92 & n.6 (8th Cir. 1998).

## A.

Erickson contends that he has shown Farmland's proffered reasons for demoting him are pretextual because they had no basis in fact.

Erickson attempts to discredit Farmland's allegation that Gales called Cleberg and complained about Erickson's performance.[5] Farmland supported this allegation by filing both Cleberg's deposition testimony and Gales's affidavit attesting to this conversation and to the reasons he was dissatisfied with Erickson. In response, Erickson offers an excerpt of a transcript of a telephone call that he taped in which a Farmland employee, Jerry Rollings, said he talked to Gales and Gales said that "[h]e has not made any phone calls." The copy of the transcript in the record is attached

---

[5]Erickson may have given up his contention that Gales did not call Cleberg. At oral argument, when asked about Gales's call, Erickson's counsel said, "That apparently happened."

-11-

to the affidavit of Erickson's attorney, which simply lists it as an exhibit. Elsewhere is an affidavit of Erickson's wife, Diane, saying she transcribed a tape of Rollings's voice. On motion for summary judgment, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Erickson offers the transcript for the truth of Gales's putative statement that he had made no phone calls, which in turn depends on the truth of Rollings's reportage. Neither statement was under oath. The transcript thus contains hearsay about hearsay. The lawyer's affidavit to which it is attached and Mrs. Erickson's affidavit contain no pretense that either has personal knowledge about the subject in issue--whether Gales called Cleberg to complain about Erickson. Erickson argues in a footnote that Rollings's statement should be considered an admission of a party opponent because Rollings was a feed manager for Farmland. Erickson has not attempted to show that this statement was made about a matter within the scope of Rollings's employment. See Fed. R. Evid. 801(d)(2)(D). At any rate, that would only eliminate one level of hearsay. We can give the transcript no effect. See Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001) (unsworn statements are hearsay, not cognizable on summary judgment motion); Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993) (inadmissible material not "properly available to defeat or support the motion."); Postscript Enters. v. City of Bridgeton, 905 F.2d 223, 226 (8th Cir. 1990) (affidavit not based on personal knowledge does not create issue of fact precluding summary judgment). Farmland's first justification for its action is essentially undisputed.

Nor does Erickson dispute that he failed to attend the fall 1997 meeting with Cleberg and the Minnesota co-ops. His counsel admitted at oral argument that Erickson was not at the meeting; counsel stated that Erickson was working elsewhere that day and counsel was uncertain about why he did not attend the meeting.

Erickson offers two kinds of evidence to rebut Farmland's contention that he had poor relationships with the co-ops in his territory. First, he offers more transcripts of tape recordings he made during telephone conversations with co-op general managers in which the managers denied that they complained about him or were dissatisfied with him. Erickson offers these unsworn, out-of-court statements for the truth of the assertions in them. This is hearsay, Fed. R. Evid. 801(c), and we cannot base a decision on it. See p.12, supra. If Erickson meant to rely on statements by these men to avoid summary judgment, he should have obtained their affidavits or depositions.

Second, Erickson relies on the performance evaluations. The most recent performance review before the demotion in February 1998 was dated October 1997. It did not have a category for co-op relations per se, but both the "sales volume" and the "retail development" scores fell in the range between "achieves expectations" and "exceeds expectations." Within the retail development category, the sub-heading for "local co-op growth projects" showed a score of "exceeds expectations." A history of positive performance evaluations can be powerful evidence of satisfactory performance. E.g., Fisher, 225 F.3d at 921. Farmland responds that it was entitled to rely on key events that occurred after the performance evaluation–the complaint from Gales, the missed meeting with Cleberg and the southern Minnesota co-ops, the phone call saying that Erickson had not been in touch with the Truman, Minnesota co-op for a year, and Walther's two-day tour with Erickson. An employer may choose to rely on recent performance more heavily than past performance. Dammen v. UniMed Med. Ctr., 236 F.3d 978, 982 (8th Cir. 2001). Viewed in light of the very serious incidents in the fall of 1997 and early 1998, Erickson's earlier performance reviews do not tend to prove that Farmland's announced concern about co-op relations was pretextual.

As for Farmland's contention that Erickson had poor relations with co-workers, Erickson maintains that this proposition contradicts the statement in his 1997

evaluation, "Bob's Minn. Team is developing well."  As we discussed above, Erickson's 1996 evaluation contained a peer review section, which Erickson's supervisor, Sander, had added out of concern that Erickson was not getting along with others within Farmland.  The peer evaluations Sander received on Erickson confirmed his belief that there was a problem, and these negative evaluations were reflected in the 1996 performance review.  The 1997 review had no peer review section.  Sander, the author of the evaluation, said the comment about Erickson's team developing well denoted that Erickson was holding staff meetings with the Farmland employees in his territory.  Sander said he believed that "[t]here were a variety of people working on . . . projects [within Erickson's territory] with some degree of harmony and joint activity efforts."  Sander testified that he was still concerned about Erickson's relations within Farmland at that time, particularly because of an anonymous letter that he received criticizing Erickson's conduct at a recent meeting in Chicago.  Sander did not discuss the incident in Erickson's review because "essentially all I had was an anonymous letter."  Sander added, "But I did verify that his participation in that meeting was essentially nil including not being even in the room for a substantial amount of the meeting."  With this significant history of problems in co-worker relations, the statement in Erickson's 1997 evaluation that "Bob's Minn. team is developing well" is not sufficient to raise a fact issue on pretext.

Erickson has not succeeded in creating an issue of fact as to whether Farmland's proffered reasons for demoting him had a basis in fact.

B.

Erickson argues that he does not need to disprove the particular reasons given by Farmland; if he is able to show strong reasons for keeping him, those reasons will cast doubt on whether Farmland was really motivated by the proffered reasons. Erickson relies on O'Bryan v. KTIV Television, 64 F.3d 1188, 1192 (8th Cir. 1995), in which we stated that an employee need not produce evidence disproving the exact

-14-

reason the employer proffered in order to show pretext. This reasoning finds more recent support in Fisher, in which the employer stated that it demoted the employee salesman because he lacked the knowledge to sell to corporate swine facilities, he could not write or speak grammatically, and he talked more about social issues than business during sales calls. 225 F.3d at 918. On the other hand, the salesman had received average or above-average reviews until the year before his demotion and had received the company's national sales award seven times. Id. The employer argued that whatever success the employee had experienced in selling to corporate livestock facilities, the three specified shortcomings were sufficient to justify the transfer. Id. at 920. This court was not persuaded. Id. We said, "In the context of sales . . . we have indicated that the selling of product is the primary responsibility of a salesperson and thus that sales volume is generally the principal indicator of a salesperson's performance." Id. The salesman's ungrammatical speech and tendency to chat instead of talking business did not impair his effectiveness as a salesman, and we therefore held that he made a prima facie case and showed pretext. Id. at 921-22.[6]

---

[6]Other circuits have said that an employee can show pretext by demonstrating that it is implausible that any employer would respond to the alleged offense the way the employer responded in the employee's case. Gordon v. United Airlines, Inc., 246 F.3d 878, 888-98 (7th Cir. 2001); Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000) (plaintiff may prove pretext by showing the employer's proffered reason insufficient to warrant its action). We have often stressed that we will not second-guess an employer's business decisions. E.g., Stuart v. Gen. Motors Corp., 217 F.3d 621, 637 (8th Cir. 2000) ("The wisdom of a company's decision to terminate its employee for what this Court may regard as a frivolous reason is not in issue in a Title VII case."); see Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994) (argument that infraction not serious enough to warrant discharge "merely questions the soundness of defendant's judgment.") Still, there is a point at which a proffered reason is so irrational that it is effectively no reason at all. See Greer v. St. Louis Reg'l Med. Ctr., 258 F.3d 843, 847 (8th Cir. 2001) (employment in different departments not "good enough" reason to justify difference in treatment of employees).

Like Fisher, Erickson has a record of satisfactory sales figures and performance evaluations. However, Erickson's satisfactory history was achieved in the RAM position, rather than the RFM position from which he was demoted. In the RAM job, Erickson was a salesman; in the RFM job, Erickson became a member of Farmland management, with an expanded responsibility to integrate the efforts of other Farmland employees. When Gales called Cleberg, his complaint was specifically that "the RFM program would be of little benefit if Mr. Erickson continued in the RFM role." Farmland presented evidence that Erickson had not performed the supervisory RFM position satisfactorily. Therefore, Erickson's evidence that he was performing well as an RAM does not create an issue of fact as to whether Farmland demoted him for deficiency in performance as an RFM.

## C.

Finally, Erickson argues that he has established pretext by introducing Walther's statements that Erickson was complacent and "set in his ways" and that the company needed "a new focus." He also cites Walther's statement, "Twenty years is too long. You should have moved five years ago."[7] These statements are not facially related to age but appear to pertain to legitimate job performance issues such as energy and enterprise. This distinguishes Erickson's case from Fast v. So. Union Co., 149 F.3d 885 (8th Cir. 1998), on which Erickson relies. Walther's remarks do not have enough probative value to raise a genuine issue of material fact as to pretext.

Erickson has not borne his burden of creating a genuine issue of material fact as to whether Farmland's proffered legitimate reasons for its action were unworthy of credence.

---

[7]See footnote 3, supra.

We have also reviewed Erickson's other miscellaneous arguments for reversal on the federal and Minnesota age claims and have determined them to be without merit.

## III.

Erickson also claims that Farmland retaliated against him by withdrawing its offer of the fertilizer sales specialist job in reaction to his March 4, 1998 age discrimination complaint. Erickson failed to show that Farmland took an adverse employment action against him, since it left open the offer of the fertilizer sales job until May 1, 1998. Erickson had notice by letter of April 13, 1998 that he needed to accept the position before that date, and, in his own words, he "just ignored" the offer. He therefore cannot establish a submissible case of retaliation.

We affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.